**The below described is SIGNED.**



**Dated: August 21, 2013**



**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

*Prepared and Submitted by:*

Matthew M. Boley, Esq. (8536)
**PARSONS KINGHORN HARRIS, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
Facsimile:  (801) 363-4378
E-mail:  mmb@pkhlawyers.com

*Atorneys for* debtor-in-possession
NUMIRA BIOSCIENCES INC.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH, NORTHERN DIVISION**

| In re:<br><br>**NUMIRA BIOSCIENCES INC.,**<br><br>Debtor. | Bankruptcy No. 13-27663 JTM<br><br>Chapter 11<br><br>Honorable Joel T. Marker |
| --- | --- |

**FINAL ORDER APPROVING POST-PETITION FACTORING  AGREEMENT,**
**(B) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE**
**EXPENSE TREATMENT, AND (C) MODIFYING AUTOMATIC STAY, PURSUANT**
**TO SECTIONS 362 AND 364 OF THE BANKRUPTCY CODE**

This matter came before the Court on August 21, 2013 at 2:00 p.m. for final hearing upon the motion of NUMIRA BIOSCIENCES INC., debtor and debtor-in-possession (the "Debtor") in the above-captioned case (the "Case"), for entry of a final order approving post-petition financing [Docket No. 15] (the "Motion").

After reviewing the Motion and other matters of record and based upon the evidence received in connection with the Motion, the Court hereby

**FINDS AND CONCLUDES** as follows:

A.      On July 5, 2013 (the "Petition Date") the Debtor filed its voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

B.      The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334.

C.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D) and (O).

D.      The Debtor requires a source of funds to pay operating expense and administrative expenses in the Case.

E.      The Debtor and Secured Party are parties to the Recourse Receivables Purchase and Security Agreement dated August 29, 2012, (the "Agreement"), a copy of which is annexed hereto as Exhibit A.

F.      The Agreement provides for advances by Secured Party to the Debtor, so long as such advances do not cause the ratio of the Debtor's obligations to Secured Party to the value (as determined in the Agreement) of the Debtor's eligible (as determined in the Agreement) accounts to exceed that set forth in the Agreement (the "Formula").

G.      As of the Petition Date, the Debtor was indebted to the Secured Party in the amount of approximately $195,000.00 (the "Pre-Petition Obligation") secured by the collateral described in the Agreement.

H.      The Debtor has offered to assign its accounts to Secured Party under the Agreement and Secured Party has agreed to consider factoring accounts from the Debtor pursuant thereto.

I.      The Debtor, notwithstanding its efforts to do so, is unable to obtain unsecured credit allowable under 11 U.S.C. Section 503(b)(1) as an administrative expense, or other than pursuant to 11 U.S.C. Section 364(c)(2) and (3), and the Debtor is unable to obtain credit on terms equal to or more favorable than those proposed by Secured Party.

J.      Secured Party has agreed to consider providing working capital to the Debtor in accordance with the Agreement in good faith, within the meaning of 11 U.S.C. Section 364(e), and all interested parties were either notified of the Motion, as evidenced by the affidavit of service, or were present at this Court's hearing on the Motion.

K.      Good cause exists for approval of the Debtor's agreement to the factoring by Secured Party under the terms of the Agreement, and the entry of this Order will minimize disruption of the Debtor as a "going concern" and is in the best interest of the Debtor, its creditors, and its estate.  The terms upon which the Debtor is authorized to utilize cash advances are determined as fair under the circumstances.

L.      The Debtor has provided written notice of the filing of the Motion to Secured Party, the United States Trustee, any Official Creditors' Committee appointed in this Case and its counsel, the twenty largest unsecured creditors of the Debtor, all of the Debtor's secured creditors, the Internal Revenue Service, and all parties who filed requests for notice as evidenced by the affidavit of service filed by the Debtor's counsel with this Court, which notice this Court finds to be appropriate and adequate under Federal Rules of Bankruptcy Procedure 2002 and 4001, and as required by Section 364 of the Bankruptcy Code.

M.      Subject to further investigation within sixty days from entry of this Order, Debtor currently believes that, as of the Petition Date, in accordance with the Agreement, the Debtor was indebted to the Secured Party, without defense, counterclaim, recoupment or setoff, in the aggregate amount of at least the Pre-Petition Obligation secured by a valid, enforceable and properly perfected lien in the collateral described therein.

N.      The Agreement with Secured Party provides a vital source of working capital for the Debtor, is in the best interests of the Debtor and its estate, and is necessary to avoid immediate and irreparable harm.

WHEREFORE, based upon the Motion, the representations of counsel in support of the Motion and at the hearing on the Motion, and the foregoing findings and conclusions it is hereby

**ORDERED** that:

1.      All capitalized terms used in this Order, not otherwise defined herein and unless otherwise indicated, shall have the meaning given them in the Agreement.

2.      The Debtor is authorized, effective immediately, to assign its accounts to the Secured Party pursuant to Bankruptcy Code Section 363, pursuant to the terms of the Agreement, and to execute all documents and take all actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

3.      Upon entry of this Order the Debtor shall be deemed to have, and is authorized and empowered to incur secured indebtedness to Secured Party pursuant to this Order and the Agreement in such amounts as needed to pay the operating expenses of the business and/or to pay the Debtor's administrative expenses, and not for any purpose prohibited by law.  Debtor's use of the proceeds of such indebtedness shall not affect the rights of Secured Party hereunder.

4.      Secured Party and Debtor may amend, modify, supplement, waive the provisions of and/or extend the term of the agreements contemplated herein without further order of the Court provided that same does not materially alter the provisions thereof.

5.      Pursuant to Section 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Debtor may grant to Secured Party a security interest in the collateral as set forth in the Agreement effective as of the date of the filing of the Bankruptcy Case ("Collateral") as collateral for all present and future obligations of the Debtor to Secured Party, including Secured Party's reasonable attorneys' fees and expenses incurred in connection with the negotiation documentation, closing and enforcement of the Agreement and the protection of Secured Party's rights in this Bankruptcy Case (the "Obligations").  The Secured Party's security interest shall be senior to the claim of any entity now or hereafter claiming an interest in the Collateral; provided, however, that this Order does not affect priority of any pre-petition liens against pre-petition Collateral and does not purport to grant Secured Party a "priming lien" against pre-petition Collateral.  The Secured Party may but need not file a Financing Statement under the Uniform Commercial Code to further perfect its security interest in the Collateral.

6.      In addition to the fees, costs, charges and expenses authorized under the Agreement, the Debtor shall pay to the Secured Party on demand without application to the

Court (but subject to review by the Official Committee of Unsecured Creditors or the U.S.

Trustee,) Secured Party's reasonable attorney's fees and other professional fees arising from or

related to the transactions contemplated herein, including without limitation the negotiating,

closing, documenting, and obtaining Court approval thereof, the enforcement of Secured Party's

rights against Debtor.

7.      Notwithstanding anything to the contrary in the Agreement or this Order, the

Collateral shall not include cash that Secured Party pays to or for the benefit of the Debtor to

purchase or acquire Purchased Accounts, and Secured Party shall have no lien or interest in such

cash.

8.      The Obligations shall constitute a super-priority administrative expense claim

under Section 364(c)(1) of the Bankruptcy Code, which shall be deemed allowed, without any

further filing by Secured Party, and which shall have priority over any and all administrative

expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

9.      To the extent that the Debtor may become indebted to any governmental entity,

whether for payroll or other taxes or otherwise, and said governmental entity is also an account

debtor of the Debtor, the governmental entity's right of setoff, defense , counterclaim or

recoupment, if any, shall be subordinate to the rights of Secured Party with respect to accounts

owing to the Debtor which comprise a portion of the Collateral, and the governmental entity

shall pay the amount owing on the account free of any claim of setoff or recoupment.

10.     For administrative convenience, Secured Party may record the pre-petition

transactions and the post-petition transactions arising under the Agreement in one account, and

apply payments on a "first in, first out" basis.

11.     The liens granted to Secured Party herein are deemed validly granted, duly

attached, and properly perfected, without the need of any additional actions being taken by or on

behalf of Secured Party, including but not limited to, the filing or recording of Uniform

Commercial Code financing statements; provided, however, that in the event Secured Party does

make such a filing or recordation, the Debtor shall execute all documents required by Secured Party to do so.

12.     Secured Party shall be the owner of Accounts purchased under the Agreement (the "Purchased Accounts") and the Purchased Accounts and all proceeds therefrom shall be the sole property of Secured Party, and will not, when purchased by Secured Party, constitute property of the estate, and shall be free and clear of any claims.  In this regard, the Debtor shall be, and hereby is, authorized to sell Accounts to Secured Party pursuant to 11 U.S.C. §§ 363(b) and/or (c), subject to and on the terms and conditions of the Agreement.  Pursuant to 11 U.S.C. § 363(f), the Purchased Accounts shall be sold and transferred to Secured Party "free and clear" of all liens and interest, with all such liens and interest to attach to the Purchase Price paid by Secured Party to the Debtor in exchange for the Purchased Accounts.

13.     Nothing in the Agreement, or in any of the documents executed in connection therewith or this Order, shall require Secured Party to provide working capital to the Debtor, such being in the sole discretion of Secured Party.

14.     Secured Party is hereby afforded the protection of Sections 363(m) and 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Order by this Court.

15.     The Debtor shall comply with all provisions of the Agreement.

16.     To the extent that any provision of the Agreement shall cause the Debtor to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions is waived by Secured Party.

17.     The Debtor shall not grant to any party any interest in the Collateral or priority in payment prior to or equal with the lien or priority in payment hereby being accorded to Secured Party.

18.     The entry of this Order and execution, delivery, and performance under the Agreement, or under any other documents executed in connection therewith, do not constitute a

compromise, waiver, or other relinquishment of any right of Secured Party at law, in equity or otherwise, including, but not limited to, any right of Secured Party to request and to obtain relief under the Bankruptcy Code.

19.     The automatic stay provisions of 11 U.S.C. Section 362 are lifted to enable Secured Party to implement the provisions of this Order and otherwise thereby to permit Secured Party to demand and receive collections on account of the Collateral, and to apply those collections to the Obligations.  Notwithstanding the foregoing, the Secured Party is not hereby granted relief from the automatic stay to enforce any other remedies against the Debtor that may be afforded under the Agreement.  With respect thereto, in the event a Default occurs under the terms of the Agreement, Secured Party shall have a right to notice an expedited hearing before this Court seeking such relief as may be deemed appropriate upon such notice as the Court shall determine to be reasonable to counsel for the Debtor; (ii) counsel for any statutory committee appointed herein or, alternatively, the twenty largest unsecured creditors; (iii) the Office of the U.S. Trustee; (iv) the United States Attorney's Office; and (v) any other creditors or other persons holding or asserting a line or interest in the Collateral.

20.     Secured Party shall have the sole right to collect all Accounts of the Debtor, including Purchased Accounts, and the Debtor shall direct all account debtors to remit payment to Secured Party.  To the extent any account debtor remits payment directly to the Debtor, the Debtor shall forward the payment Secured Party and is not authorized to deposit or use such "cash collateral."  The Debtor may not use any "cash collateral" constituting the proceeds of Accounts; provided, however, that for the purposes of this Order "cash collateral" shall not include any funds that Secured Party advances, releases or pays over to the Debtor, including portions of the Purchase Price advanced or paid to the Debtor and any collected funds in the Reserve Account in excess of the Reserve Amount that are paid or delivered to the Debtor.

21.     The Debtor will not propose a Plan of Reorganization that requires Secured Party to accept less than the full amount of Secured Party's secured claim as of the date of commencement of this case.

22.     The Debtor will not seek to surcharge the Purchased Accounts with any expenses of the type described in Section 506(c) or 552(b) of the Bankruptcy Code unless it obtained Secured Party's prior written consent to the incurrence of such expenses.

23.     The Agreement is enforceable according to its terms and nothing contained therein is unlawful, unenforceable or violates of any usury or similar statute.

24.     An event of default under this Order ("Default") shall include the following:

   a.     the Debtor's failure to perform or comply with any of the terms, conditions, or covenants of this Order;

   b.     The Debtor's failure to perform or comply with any of the terms, conditions, or covenants of the Agreement;

   c.     The termination of this Order by its own terms, operation of law or court order;

   d.     The dismissal of this Bankruptcy Case;

   e.     The appointment of a trustee under the Bankruptcy Code;

   f.     The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code;

25.     Upon the occurrence of a Default, Secured Party shall provide the Debtor and its counsel (and, if applicable, any committed formed in the Case and its counsel) with written notice of such Default.  If the Default is a type that is not curable, or is curable by the Debtor and the Debtor fails to cure the Default within ten (10) business days from the time of service of such notice of the Default, Secured Party shall be entitled to an expedited hearing on a motion for immediate relief from the automatic stay under Section 362 (the "Stay Relief Motion").  The

only issue for consideration by the Court with respect to the Stay Relief Motion is whether a Default has occurred and/or has been cured.

26.     Notwithstanding anything to the contrary contained herein, the proceeds of any advance from Secured Party, shall not be used either: (a) in connection with the investigation, assertion, commencement, or continuation of any action or claim against Secured Party or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of any rights or claims of the Secured Party.

27.     This Order is without prejudice to Secured Party's rights to pursue any and all rights and remedies under the Bankruptcy Code, the Agreement, and any other applicable agreement or law, including without limitation to seek relief from the automatic stay and/or to seek adequate protection with respect to matters not covered by this Order, to seek an injunction, and/or to object to applications for allowance and/or payment of compensation of professionals employed by the Debtor or its estate.

28.     This Final Order shall be without prejudice to any rights of the Debtor and any other party-in-interest to challenge, to the extent permitted under applicable law, the validity, priority, perfection, enforceability or extent of the claims, liens and other rights granted to Secured Party prior to the commencement of this case, provided that such challenge must be made no later than sixty days from the date of entry of this Order, after which time such challenge shall be forever barred.



------------------------------------ END OF ORDER ------------------------------------

## <u>DESIGNATION OF PARTIES TO BE SERVED</u>

      Service of the foregoing **ORDER** should be to the parties and in the manner designated below:

**By Electronic Service**:  I certify that the parties of record in this case as identified below, are registered CM/ECF users, and will be served notice of entry of the foregoing Order through the CM/ECF System:

- Matthew M. Boley     mmb@pkhlawyers.com, jh@pkhlawyers.com
- Mona Lyman Burton     mburton@hollandhart.com, ckelly@hollandhart.com;intaketeam@hollandhart.com;slclitdocket@hollandhart.com
- Laurie A. Cayton tr     laurie.cayton@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Victor P Copeland     vpc@pkhlawyers.com, js@pkhlawyers.com
- Joseph M.R. Covey     calendar@parrbrown.com
- George B. Hofmann     gbh@pkhlawyers.com, dh@pkhlawyers.com
- Robert Lund     robertelund@gmail.com
- Sherilyn A. Olsen     solsen@hollandhart.com, slclitdocket@hollandhart.com;intaketeam@hollandhart.com;ckelly@hollandhart.com
- United States Trustee     USTPRegion19.SK.ECF@usdoj.gov

**By U.S. Mail**:  In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

    ☒    None

    ☐    If there are additional parties list the names and addresses of the additional parties.

    ☐    All parties on the Court's official case matrix.

        /s/ Matthew M. Boley_____

Exhibit A

{00173920.DOC /}

*Porter Capital Corporation*

**RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

| **SELLER** | **PURCHASER** |
|---|---|
| Name: **Numira Biosciences Inc.** | Name: **Porter Capital Corporation** |
| By: _____ [signature] | By: _____ [signature] |
| Officer's Name Printed: Michael Beeuwsaert | Officer's Name Printed: Marc Porter |
| Its: President | Its: President |
| Street Address: 560 Arapeen Drive, Suite 250 Salt Lake City, UT 84108 | Street Address: 2112 First Avenue North, Birmingham, AL, 35203 |
| Mailing Address: Same as above | Mailing Address: PO Box 12105, Birmingham, AL, 35203 |
| Email Address: mbeeuwsaert@numirabio.com | Email Address: mporter@portercap.net |
| State of Organization: Delaware | State of Organization: Alabama |
| Federal Tax ID: 42-1683793 | Federal Tax ID: 63-1077133 |
| State and County of Principal Office: Utah, Salt Lake County | State and County of Principal |

State of **Utah** ) County of **Salt Lake** )

On August **29**, 2012, before me, the undersigned, a Notary Public in and for said State, personally appeared the above-named representative of Seller, who is personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the persons, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary Signature: _____ (Seal)

*[Notary stamp: MERCEDEEZ BERLING, NOTARY PUBLIC - STATE OF UTAH, 560 N GROSE #1, SALT LAKE CITY, UT 84116, COMMISSION NO. 646733, COMM. EXP. 10/03/2015]*

This RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT ("Agreement") is made as of the **29th** day of August, 2012 by and between the above-named Seller (**"Seller"**) and Porter Capital Corporation (**"Purchaser"**).

**1. DEFINITIONS.** The following terms used herein shall have the following meanings. All capitalized terms not herein defined shall have the meanings set forth in the Alabama Uniform Commercial Code:

"Accounts" – any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance, or such additional meaning as shall be given to the term Accounts under the Uniform Commercial Code as adopted in the State of Alabama.

"Accounts Transmittal" – a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement and to which are attached copies of all invoices which relate to the Accounts described therein.

"Advance Rate" – the Advance Rate set forth on **"Schedule A."**

"Actual/365 Computation" - a method used by Purchaser in determining the annual effective yield by taking the stated (nominal) rate for a year's period and then dividing said rate by 365 to determine the daily periodic rate be applied for each day in the applicable period.

"Clearance Days" - Three (3) business days for Account Debtors located in Alabama, and five (5) business days for Account Debtors located outside Alabama.

"Collateral" - any collateral now or hereafter described in any financing statement filed against Seller naming Purchaser as the secured party (which financing statement may describe the collateral as "All assets."), and all of Seller's personal property, both now owned and hereafter acquired, and wherever located, including, but not limited to: Accounts (including Accounts purchased by Purchaser hereunder and repurchased by Seller); Chattel Paper; Deposit Accounts; Documents; Equipment; Farm Products; Fixtures; General Intangibles; Goods; Instruments; Inventory; Investment Property; Letter or Credit Rights; and the Proceeds or Proceeds of Proceeds of all of the foregoing, including, without limitation all insurance proceeds and all claims against others for loss or destruction of or damage to any of the foregoing.

"Discount Fee" - The Discount Fee Percent multiplied by the original Face Amount of each Purchased Account.

"Discount Fee Percent" – the Discount Fee Percent set forth on **"Schedule A."**

"Dispute" - a claim by an Account Debtor that the goods or services which are the subject of a Purchased Account were not delivered or accepted in accordance with the agreement between the Account Debtor and Seller, whether or not such dispute is valid.

"Due Diligence Fee" – the Due Diligence Fee set forth on **"Schedule A."**

"Eligible Account" - An Account which is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

"Events of Default" – the Events of Default set forth in Section 11.1.

"Face Amount" -The face amount due on an Account.

1 of 10

Please Initial _____

*Porter Capital Corporation*                    **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

"Initial Term" – the Initial Term set forth on **"Schedule A."**

"Insolvency Event" - either (i) the filing of a petition under any state or federal debtor relief or liquidation statute by or against an Account Debtor, or (ii) the failure of an Account Debtor to pay a Purchased Account within 90 days from the invoice date, so long as such failure to pay was not the result of a Dispute.

"Interest Rate" – the Prime Rate plus the margin set forth on "**Schedule A.**"

"Late Fee" - any fee charged pursuant to section 3.4 of this Agreement.

"Line Amount" - the Line Amount set forth on **"Schedule A."**

"Minimum Term Fee" – Three percent (3.0%) multiplied by the Minimum Average Monthly Volume multiplied by the number of months in the Initial Term or any Renewal Term.

"Minimum Average Monthly Volume" – the Minimum Average Monthly Volume set forth on **"Schedule A.**

"Misdirected Payment Fee" – the greater of $5,000.00 or twenty-five **(25%)** of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

"Notation" – Invoice is assigned and payable to:

i. If by check, mail to the following address:

**PORTER CAPITAL CORPORATION**
**PO Box 12105**
**Birmingham, Alabama 35203**
**For Account of: Numira Biosciences Inc.**

Please show invoice and/or account number on check.

ii. If by electronic remittance, to:

**Columbus Bank & Trust**
**Columbus, GA 31901**
**Account Name: Porter Capital Corporation**
**ABA Routing Number: 061100606**
**Account Number: 30101603**
**For Account of: Numira Biosciences Inc.**

"Obligations" – all obligations of Seller under this Agreement and all present and future indebtedness and obligations due or owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by this Agreement, a note or any other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or un-liquidated, secured or unsecured, original or renewed or extended, including but not limited to any obligations arising pursuant to other financial accommodations; and all principal, Reserve Shortfall, interest, Misdirected Payment Fees, Due Diligence Fees, Origination/Renewal Fees, Wire Transfer Fees, ACH Transfer Fees, late charges, fees, expenses, attorneys' fees and accountants' fees chargeable to Seller or incurred by Purchaser in connection with this Agreement and/or the transaction(s) related thereto.

"Origination/Renewal Fee" – the Origination/Renewal Fee set forth on **"Schedule A."**

"Parties" - Seller and Purchaser.

"Prime Rate" – the Prime Rate as used herein shall be the greater of the prime rate as published in the Wall Street Journal as the "Prime Rate" (base rate on corporate loans posted by at least 75% of the nation's 30 largest banks) or five percent per annum.

"Purchase Price" - The Face Amount less the Discount Fee.

"Purchased Accounts" - Accounts purchased hereunder which have not been Repurchased.

"Recourse Account" – shall mean the portion of any Purchased Account that remains unpaid for more than the Repurchase Period from the date of the invoice, or any portion of any Purchased Account that Purchaser determines no longer an Eligible Account.

"Repurchase Period" – the Repurchase Period as set forth on "**Schedule A.**"

"Repurchased" - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" - the Reserve Percentage multiplied by the unpaid balance due Purchaser on the Purchased Accounts.

"Reserve Account" - a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" – the Reserve Percentage as set forth on **"Schedule A."**

"Reserve Release Frequency Period" – The time period during which Seller may make one request that the funds in the Reserve Account in excess of the Required Reserve Account be paid to Seller. The time period for the Reserve Release Frequency Period is specified in **"Schedule A."**

"Reserve Shortfall" - The amount by which the Reserve Account is less than the Required Reserve Amount.

**2. SALE; PURCHASE PRICE; BILLING; NOTATION; RESERVE.**

2.1 Assignment and Sale. Seller shall sell to Purchaser as absolute owner, with full recourse, such of Seller's Accounts as are listed from time to time on Accounts Transmittal. Each Accounts Transmittal shall be accompanied by such documentation evidencing the Account as Purchaser shall from time to time request. Purchaser may purchase from Seller such Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of Purchased Accounts does not exceed, before and after such purchase, the Line Amount. Purchaser shall incur no liability to Seller for refusal to purchase an Account determined not to be an Eligible Account. All Accounts Transmittals, whether or not it is specifically set forth therein, shall constitute a representation by the Seller that it is solvent, has not and is not contemplating filing bankruptcy and that all Accounts represented thereby are valid, enforceable, payable and actual and not subject to setoffs, defenses or competing claims by any party. Seller shall make all appropriate accounting entries on its books and records to reflect that Purchased Accounts have been sold to Purchaser.

Please Initial *MB*

*Porter Capital Corporation*                    **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

2.2 Purchase Price. Purchaser shall pay the Purchase Price as follows: Within two (2) business days following the determination that an Account is an Eligible Account and Purchaser's receipt of an Accounts Transmittal, countersigned by the Seller, Purchaser shall pay Seller an amount equal to the Advance Rate times the Face Amount of Eligible Accounts reflected on such Accounts Transmittal whereupon the Eligible Accounts set forth in the Accounts Transmittal shall be deemed purchased. The balance of the Purchase Price shall be applied to the Reserve Account and/or any Obligations then due Purchaser by Seller under this Agreement.

2.3 Billing. Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period.

2.4 Notation. Seller shall instruct all Account Debtors on the Purchased Accounts to make payments pursuant to the Notation, and Purchaser may also instruct all Account Debtors to make payments pursuant to the Notation.

2.5 Reserve Account. Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall. Without limiting the foregoing, Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall. Purchaser shall pay to Seller upon Seller's request any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided that Seller shall be entitled to make such demand not more than once during each Reserve Release Frequency Period, unless otherwise agreed to by Purchaser in Purchaser's discretion. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. Amounts Purchaser is entitled to charge to the Reserve Account, which remain unpaid after Purchaser's demand, shall accrue Late Charges.

2.6 Collection of Purchased Accounts. Purchaser (as purchaser of the Purchased Accounts) shall administer the collection of all of the Purchased Accounts. Purchaser shall have the right of assignment to and endorsement of the Purchased Account and all payments received in connection with each Purchased Account and the Seller hereby appoints Purchaser the attorney-in-fact and agent of the Seller for this purpose, which appointment is coupled with an interest and is irrevocable during the term of this Agreement. Purchaser shall have no liability to the Seller for any mistake in the application of any payment received by it with respect to any Purchased Account, so long as it acts in good faith.

3. **PAYMENT; OBLIGATION OF SELLER**. While this Agreement establishes the agreement of Purchaser to purchase and pay Seller for Eligible Accounts set forth in the Accounts Transmittal, it also establishes payment and performance obligations of Seller to Purchaser. With respect to such Obligation owed by Seller to Purchaser, Seller shall pay to Purchaser:

3.1 Interest. Interest, at the Interest Rate on an amount equal to (i) the unpaid balance of the Purchase Price minus the Reserve Account, as such amounts change from time to time plus (ii) outstanding fees or other Obligations owed by Seller

to Purchaser hereunder, which shall be computed on the basis of a an Actual/365 Computation; and

3.2 Minimum Term Fee. Any amount by which the actual Discount Fees plus the Interest paid during the Initial Term, or if applicable during any Renewal Term, are less than the Minimum Term Fee.

3.3 Calculation of and Payment of Interest. All accrued interest shall be calculated monthly on the last calendar day of the month in which it accrues using the Interest Rate in effect as of the first business day of that month and paid by Seller on the first business day of the next month. Any change in the Interest Rate shall take place simultaneously with any corresponding change as set forth in the Prime Rate from time to time.

3.4 Late Charges. In addition to the foregoing, Seller shall also pay to Purchaser a late fee of .05% per day on any and all amounts due to Purchaser from Seller pursuant to this Agreement until such amounts are paid in full. Late Charges will not apply to amounts due to Purchaser on Accounts (but shall apply to other amounts) unless and until Seller is obligated under this Agreement to repurchase such Accounts, at which time Late Charges will accrue until the Account and Late Charges are paid in full. Late Charges shall be paid and are due within one business day following the occurrence of the event which makes Seller obligated to Purchaser for any Late Charges.

3.5 Due Diligence Fee; Origination/Renewal Fee. In addition to the foregoing, Seller shall pay to Purchaser the Due Diligence Fee upon execution of this Agreement, and the Origination/Renewal Fee at the time of the first funding during the Initial Term and at the beginning of each succeeding Renewal Term.

3.6 Other Amounts. All other Obligations or expenses, including, without limitation, Misdirected Payment Fees, Wire Transfer Fees, ACH Transfer Fees, any attorney fees, UCC search fees, UCC filing fees, out of pocket or internal expenses, or any wire transfer, postage, audit or returned check fees that are incurred by Purchaser or are specified in **"Schedule A"** shall be paid to Purchaser by Seller within one business day following the day such expenses are incurred by Purchaser.

4. **REPURCHASE OF ACCOUNTS**. Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account: (i) any Purchased Account in Dispute, subject to an Insolvency Event, or for which Purchaser is required to disgorge; (ii) all Purchased Accounts upon the occurrence of an Event of Default or upon the termination date of this Agreement; or (iii) any Purchased Account that remains unpaid after the expiration of the Repurchase Period. Purchaser shall retain a security interest in any Purchased Account that is repurchased.

5. **SECURITY INTEREST**. Seller grants to Purchaser a continuing first priority security interest in and to the Collateral to secure the Obligations. Seller will cooperate with Purchaser in Purchaser's obtaining control with respect to depository accounts, investment property, letter of credit rights, and/or electronic chattel paper. Seller shall take all

Please Initial

*Porter Capital Corporation*                          **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

actions appropriate to perfect the Purchaser's security interest in the Collateral and authorizes Purchaser to create and file any and all financing statements, amendments corrections or releases as are necessary to perfect and maintain its security interest.

6. **COLLECTION CLEARANCE PERIOD**. For all purposes under this Agreement, Clearance Days will be added to the date on which any payment is received by Purchaser.

7. **AUTHORIZATION TO PURCHASER**.

7.1 Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, and irrevocably appoints Purchaser as Seller's attorney in fact to exercise at any times in Purchaser's or such designee's discretion and in Seller's name all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization on the Accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations, (e) file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, which may describe the Collateral as "All Assets" of Seller, (f) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable, (g) file in the Seller's or Purchaser's name or both any mechanic's lien or claim under a payment bond connected to the goods or services of Seller; and (h) at any time, irrespective of whether an Event of Default has occurred, without notice to or the assent of Seller, notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order solely to Purchaser.

7.2 Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages.

7.3 Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller to satisfy any of the Obligations.

8. **COVENANTS BY SELLER**.

8.1 Seller warrants, represents, covenants and recognizes that the Purchase Accounts are the sole property of Purchaser, and Seller shall not, collect same, or without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Further Seller shall, immediately upon the sale of a Purchased Account, make proper entries on its books and records disclosing the absolute sale and assignment of such Purchased Account to Purchaser.

8.2 After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the Collateral which includes a monetary obligation, (b) compromise or settle any of the Collateral for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Collateral.

8.3 From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts there from as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

8.4 Before sending any invoice evidencing an Account to the Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

8.5 Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser no less than ten days after the filing in such form as Purchaser shall reasonably require on no less than a monthly basis.

8.6 Seller shall not, without the prior written consent of Purchaser suffer to exist any lien (including any encumbrance or security interest) of any kind upon any of its assets, whether now owned or hereafter acquired.

8.7 Seller shall not change its state of incorporation or organization; consolidate or merge with another entity; change its name; or transfer, sell, lease or assign any of its assets out of the ordinary course of business to another entity without Purchaser's written consent and at least thirty (30) days prior to any such proposed change.

**Please Initial** _MMB_

*Porter Capital Corporation*                    **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

8.8 If payment of any Purchased Account, or Recourse Account is made directly to Seller, such payment shall be deemed to have been received in trust for Purchaser, and Seller shall not deposit or convert such funds and by the next banking day following the date of receipt, shall send the same, properly endorsed, if necessary, to the "Notation" designated herein. In the event Seller at any time cashes or deposits to its own account a payment on any Purchased Account received directly, such action by Seller shall be considered a breach of this Agreement and if not returned immediately, be subject to, in addition to the Misdirected Payment Fee, such other criminal and civil remedies to which Purchaser is entitled.

8.9 Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion, with Purchaser shown as additional insured. Seller shall furnish to Purchaser upon written request, any and all information concerning such insurance carried. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser.

8.10 Seller is solely responsible for paying all expenses of its business including by not limited to the timely filing and depositing on all payroll tax contributions, required or withholding levied or fixed by any governmental authority of Seller's permanent and temporary employees.

8.11 Seller shall indemnify Purchaser from any loss arising out of the assertion of any avoidance claim or preference action initiated under the United States Bankruptcy Code and shall pay to Purchaser on demand the amount thereof. Seller shall notify Purchaser within two business days of Seller becoming aware of any avoidance claim or preference action. The Seller's duties with regard to avoidance claims or preference actions shall survive the termination of this Agreement.

8.12 Seller also  will not, under any circumstances or in any manner whatsoever, interfere with any of Purchaser's rights under this Agreement or misdirect the payment of any Purchased Account.

8.13 Seller shall not factor, finance, give a security interest or sell any of its Accounts to any person or entity other than Purchaser during the term of this Agreement, nor shall any Accounts to be purchased under this Agreement be previously sold, pledged or encumbered by Seller or any other person or entity in any manner whatsoever.

8.14 Seller shall give Purchaser prompt written notice of any levy, attachment, legal process, or notice of default as soon as same is received by Seller or as to which Seller has knowledge.

8.15 Seller shall defend title to the Collateral against all persons and against all claims and demands whatsoever, which Collateral, except for the security interest granted hereby, is  lawfully owned by the Seller and is now free and clear of any and all liens, security interests, claims, charges,

encumbrances, taxes and assessments except as may be set forth specifically herein.

8.16 Seller shall pay, when due, all taxes, assessments, and license fees relating to the Collateral.

8.17 Seller shall keep the Collateral, at the Seller's own cost and expense, in good repair and condition and not to misuse, abuse, waste, or allow to deteriorate except for normal wear and tear and to make the same available for inspection by Purchaser at all reasonable times.

8.18 If requested by Purchaser, Seller shall cause Purchaser to be shown as lender's loss payee or mortgagee on all insurance policies insuring the Collateral, and deposit with Purchaser such certificates of insurance or policies as from time to time requested by Purchaser. Seller shall give immediate written notice to Purchaser and to insurers of loss or potential loss or damage to the Collateral and shall promptly file proofs of loss or potential loss with insurers. Seller hereby appoints Purchaser its attorney-in-fact in obtaining, adjusting and canceling any such insurance and endorsing settlement drafts and hereby assigns to Purchaser all sums which may become payable under such insurance, including return premiums and dividends, as additional security for the Obligations.

8.19 Seller shall immediately notify Purchaser in writing of any change in or discontinuance of Seller's place or places of business.

9. **ACCOUNT DISPUTES**. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all Disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the Dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may resolve such issues with respect to any Account of Seller.

10.    **REPRESENTATION AND WARRANTY**. Seller represents and warrants that: it is fully authorized to enter into this Agreement and to perform hereunder; this Agreement constitutes its legal, valid and binding obligation; Seller is solvent and in good standing in the state of its organization; Seller's state of incorporation or organization and exact legal name are set forth in the box of this Agreement; Seller's chief executive office is located at the address set forth in the box of this Agreement; and the Purchased Accounts are bona fide existing obligations without adjustment, claims, defenses, disputes or rights to setoff or cancellation, are not sales to affiliated entities, parent companies or subsidiaries of the Seller and Seller has received no notice or otherwise learned of any actual or imminent bankruptcy, insolvency or material impairment of the account debtors and Purchased Accounts.

**Please Initial** *UMB*

*Porter Capital Corporation*                    **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

11. **DEFAULT**.

11.1 Events of Default. The following events will constitute an Event of Default hereunder: (i) Seller defaults in the payment of any Obligations, (ii) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (iii) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (iv) Seller breaches any present or future covenant or agreement contained in this Agreement, or any other present or future contract or agreement with the Purchaser, (v) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations, or (vi) Seller breaches of any term, provision, warranty, or representation under any other agreement or contract between Seller and CapitalPartners Leasing LLC and/or Porter Bridge Loan Company, Inc., or fails to pay any obligation due CapitalPartners Leasing LLC and/or Porter Bridge Loan Company, Inc.

11.2 Effect of Default. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, with or without notice to Seller, Purchaser may immediately terminate its duties under this Agreement, at which time all Obligations shall immediately become due and payable without notice and Purchaser shall have the right to withhold any payments due to Seller until such times as all the Obligations are satisfied and paid in full. In addition Purchaser shall have all of the rights of a secured party under the Uniform Commercial Code, including without limitation the right to take possession and control of any Collateral and sell the same either collectively or in lots at one or more private or public sale and Seller will remain liable for any deficiency. If Purchaser sells any of the Collateral upon credit, Seller will be credited only with payments actually made by the purchaser of the Collateral, received by Purchaser and applied to the indebtedness of the purchaser. In the event the purchaser of the Collateral fails to pay for the Collateral, Purchaser may resell the Collateral, and Seller will be credited with the proceeds of the sale. Purchaser may but shall not be required to proceed against Collateral but may proceed against the Seller or any guarantor of Seller and the Obligations directly. Purchaser waives any and all  rights it may have to marshalling of assets.

In addition to the foregoing, Purchaser may declare the Obligations immediately due and payable, enforce the security interest given hereunder, require Seller to assemble any Collateral secured hereunder and the records pertaining thereto and make them available to Purchaser at a place designated by Purchaser, enter the premises of Seller and take possession of any Collateral not then in its possession and of the records pertaining thereto, grant extensions, compromise claims, and settle collection of any Accounts forming the basis of the Collateral for less than face value, all without prior notice to Seller, use, in connection with any assembly or disposition of the Collateral, any trademark, trade name, trade style, copyright, patent right, or technical process used or utilized by Seller, and return any surplus realized and hold Seller liable for any deficiency.

11.3 No Waiver. Any failure to or decision by Purchaser not to exercise all of its rights upon an Event of Default shall not constitute or be deemed a waiver of such rights as to current or future Events of Default. Any rights and remedies of Purchaser herein against the Seller or any guarantor of Seller or the Obligations are cumulative and not alternative.

12. **TERMS**

12.1 This Agreement shall be effective for a period commencing on the date hereof and shall continue until the end of the Initial Term. This Agreement shall be deemed to be automatically renewed for an additional term equal in length to the Initial Term (the "Renewal Term") at the expiration of the Initial Term, and thereafter to be automatically renewed for succeeding terms at the end of the first and each succeeding Renewal Term, unless the Seller shall deliver written notice of cancellation to Purchaser no sooner than ninety and no later than sixty days prior to the expiration date of the Initial Term or any succeeding Renewal Term. No such termination shall terminate or otherwise affect Seller's obligations hereunder incurred or accrued prior to such termination.

12.2 The representations, warranties and covenants of the Seller and the remedies of Purchaser for a breach of such representations, warranties and/or covenants, shall survive the termination of this Agreement, and such termination shall not effect the rights of Purchaser to enforce its remedies under the agreements executed in connection herewith against the Seller or against any Collateral after a default by the Seller. Upon termination, the Seller shall remain fully responsible to Purchaser for any Purchased Accounts purchased prior to such termination. Additionally, Purchaser shall maintain its security interest in the Collateral until all of the Obligations have been paid in full.

13. **AMENDMENT**. No part of this Agreement may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

14. **NO LIEN TERMINATION WITHOUT RELEASE**. In recognition of Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser.

15. **FINANCIAL STATEMENTS**.  During the term of this Agreement, Seller agrees to provide Purchaser with such financial statements and records and such other information as may be reasonably requested by Purchaser from time to time, and each quarter, within twenty days following the end of the respective quarter, shall furnish current financial statement, an updated customer list with customer names, contact names, addresses, and phone numbers, as well as a complete and current payables-aging report.

6 of 10

**Please Initial** _____

*Porter Capital Corporation*                    **RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

16. **SEVERABILITY**. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

17. **RELATIONSHIP OF PARTIES**. The relationship of the Parties hereto shall be that of Seller and Purchaser of Accounts and not that of borrower and lender, and neither party is or shall be deemed a fiduciary of or to the other. This is a purchase and sale transaction and it does not constitute financing. The rights, obligations and remedies contained herein shall inure to and be binding on the parties hereto and on their respective legal representatives, successors and assigns

18. **ATTORNEYS' FEES**. Seller is obligated to pay to Purchaser all of Purchaser's reasonable attorneys' fees, legal costs and expenses, collection, prosecution or defense costs, travel expenses, and other expenses incurred by Purchaser in connection with this Agreement or in connection with enforcing Purchaser's rights hereunder, or in connection with being involved in a legal action related hereto, or in responding to legal process concerning Seller or any account purchased hereunder. Purchaser's reasonable attorneys' fees shall be at least 20% of the then unpaid Obligations.

19. **ENTIRE AGREEMENT**. This Agreement, including all terms and conditions specified in any of the Schedules attached hereto, supersedes all prior or contemporaneous agreements and understandings between the Parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

20. **CHOICE OF LAW**. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Alabama.

21. **JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION INVOLVING BOTH OF THEM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

22. **LEGAL ACTION**. Any action between the Parties shall, if Purchaser so elects, be instituted in the federal or state court located in Jefferson County, Alabama (the "Acceptable Forum"). Each party irrevocably submits to the jurisdiction of the Acceptable Forum, and waives all attempts to transfer to any other forums. Should any action be initiated in any other forum, Seller shall not oppose any attempt to have the action transferred to the Acceptable Forum.

23. **INDEMNIFICATION**. Seller agrees to indemnify, defend and hold Purchaser harmless from any and all claims, damages, actions, or judgments, including without limitation those for attorney's fees, which Purchaser may have to pay and defend against with respect to any third party claims arising out of the transactions entered into pursuant to the terms and conditions of this Agreement.

24. **NOTICE**. All notices required hereunder must be in writing (paper or electronic) and shall be deemed received by Seller upon the earlier of actual receipt via electronic transmittal, express courier, or other means or, if that fails, via first class United States Mail properly addressed to the address first set forth above with a copy to 2112 First Avenue North, Birmingham, AL, 35203. All notices required to be given to Seller shall be deemed given upon the first to occur of: deposit thereof in a receptacle under the control of the United States Postal Service; transmittal by electronic or telephonic means to a receiver under the control of Seller, or actual receipt by Seller or an employee or agent of Seller. All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

25. **TIME IS OF THE ESSENCE**. In all matters pertaining to this Agreement, time is of the essence.

**Please Initial**

*Porter Capital Corporation*

**RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**
**SCHEDULE A – PRICING AND TERM SHEET**

This schedule is Schedule "A" to that Recourse Receivables Purchase & Security Agreement by and between **Porter Capital Corporation** (Purchaser), and **Numira Biosciences Inc.** (Seller) and is incorporated therein and apart thereof.

| | | | |
|---|---|---|---|
| **Seller** | **Numira Biosciences Inc.** | | |
| **Credit Facility** | Recourse Receivables Purchase & Security Agreement | | |
| **Minimum Average Monthly Volume** | $250,000 | | |
| **Line Amount** | $750,000 | | |
| **Initial Term** | one (1) year | | |
| **Advance Rate** | 85% of Eligible Accounts being purchased | | |
| **Reserve Percentage** | 15% of the Unpaid Balance of Purchased Accounts | | |
| **Reserve Release Frequency** | As requested by Seller provided same is available. | | |
| **Repurchase Period** | Ninety(90) days From Invoice Date | | |
| **Discount Fees** | | **Discount Fee** | **Period** |
| | Initial Period | 1.45% | First 30 days |
| | Subsequent Periods | An additional 0.4% | Each 10 days |
| **Interest Rate (Prime +)** | Waived | | |
| **Due Diligence Fee** | $395.00 | | |
| **Origination/Renewal Fee** | 1.0% of Line Amount | | |
| **Wire Transfer Fee** | $25.00 Per Transfer | | |
| **ACH Transfer Fee** | $10.00 Per Transfer | | |
| **Other Considerations** | N/A | | |

Please Initial

Porter Capital Corporation                                        SECRETARY'S CERTIFICATE

## SECRETARY'S CERTIFICATE

I, *Michael Beeuwsaert* hereby state that I am the duly elected, acting and qualified secretary of NUMIRA BIOSCIENCES INC., an entity organized and existing under and by virtue of the laws of the state of Delaware (the "Company"), that I am the keeper of the entity records and seal of the Company, and that:

Through a unanimous consent in lieu of a board of directors meeting or a meeting of the members or partners of the Company, proposed in accordance with its bylaws, organizational or governing documents and the aforesaid laws, the following resolutions were duly and regularly adopted:

**RESOLVED,** that the form, terms and provisions of all of the documents and instruments in the form attached hereto executed by the Company with and/or in favor of PORTER CAPITAL CORPORATION (the "Agreements"), and the transactions contemplated thereby be, and the same are, in all respects approved, and that the President, Vice President, Member, Manager, Partner and each other officer of the Company (the "Authorized Persons"), or any of them, be, and they hereby are, authorized, empowered, and directed to execute and deliver the Agreements and any and all other agreements, documents, instruments and certificates required or desirable in connection therewith, if necessary or advisable, with such changes as they may deem in the best interest of the Company, and their execution and delivery of the Agreements, and all such other agreements, documents, instruments and certificates, shall be deemed to be conclusive evidence that the same are in all respects authorized and approved; and be it further

**RESOLVED,** that the actions of any Authorized Person heretofore taken in furtherance of the Agreements be, and hereby are, approved, adopted and ratified in all respects.

The above resolutions: (a) are not contrary to the articles of incorporation, articles of organization, partnership agreement, operating agreement, bylaws organizational or other governing documents of the Company, as applicable, and (b) have not been amended, modified, rescinded or revoked and are in full force and effect on the date hereof.

The following persons are duly qualified and acting officers of the Company, duly elected to the offices set forth opposite their respective names, and the signature appearing opposite the name of each such officer is his authentic signature:

| Name | Officer | Signature |
|------|---------|-----------|
| Michael Beeuwsaert | President | |
| David Weinstein, Ph.D. | CTO | |
| | Secretary | |
| | Treasurer | |
| | Member | |
| | Manager | |
| | Partner | |

IN WITNESS WHEREOF, I have executed this Certificate, this 29TH day of August, 2012

*Michael Beeuwsaert*

Secretary

[SEAL]

*Numira Biosciences Inc. CORPORATE Seal 2005 DELAWARE*

9 of 10

Please Initial *MB*

**Intentionally Left Blank**

Please Initial

# AMENDMENT

# TO

# RECOURSE RECEIVABLES
# PURCHASE & SECURITY AGREEMENT

THIS AMENDMENT TO RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT is entered into by and between NUMIRA BIOSCIENCES INC. (hereinafter "Seller ") and PORTER CAPITAL CORPORATION (hereinafter "Purchaser").

**WHEREAS,** Purchaser is agreeable to make such changes, provided that Seller executes this amendment and pays Purchaser the fees and expenses incurred by Purchaser in preparing this amendment.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, Seller and Purchaser agree and make the following changes to the Agreement:

1. **Discount Fees:**

| | | |
|---|---|---|
| Initial Period | 1.6% | First 30 days |
| Subsequent Periods | An Additional 0.5% | Each 10 days |

**SELLER HEREBY AGREES** and directs Purchaser to take any action necessary to conform the Agreement, or the documents executed in connection therewith (the "Agreement Documents") to the terms as herein cited and to the extent necessary to carry out the intent of this agreement, and Seller does hereby accepts and confirms their liability under said Agreement and Agreement Documents with the terms as herein modified. Without limiting the generality of the foregoing, each reference in the Agreement Documents to the Agreement or any other Agreement Documents shall be deemed to be references to said documents, as amended hereby.  As amended hereby, all of the Agreement Documents shall remain in full force and effect in accordance with their respective terms and shall continue to evidence, secure, guarantee or relate to, as the case may be, the Agreement. This amendment amends the Agreement and is not a novation thereof.  All terms of the Agreement, not specifically amended hereby remain in full force and effect.

**SELLER FURTHER AGREES** that the herein amendment shall in no way affect or otherwise release any collateral held by Purchaser as security on said Agreement and same shall continue to secure said Agreement as modified by the herein amendment.

**SELLER FURTHER** remakes and reaffirms each and every representation and warranty contained in the Agreement and the Agreement Documents as of the date hereof, and Seller hereby represents that Seller has no offsets or claims against Purchaser arising under, related to, or connected with the Agreement or any of the Agreement Documents.

**PURCHASER** does hereby reserve all rights and remedies it may have against all parties

secondarily liable for repayment of the indebtedness evidenced by the Agreement or the Agreement Documents. The Agreement and Agreement Documents, as herein modified, contain the entire agreement of the parties and the undersigned do hereby ratify and confirm the terms of the Agreement and Agreement Documents, all of which shall remain in full force and effect, as modified herein.  This amendment shall be binding upon any assignee and successor in interest of the parties hereto.

All of the costs and expenses incurred by Purchaser in connection with this amendment shall be paid by Seller upon the request of and at the time of demand for payment thereof made by Purchaser on Seller.

**PURCHASER** shall not have any obligation or responsibility to do any of the following: (1) protect and preserve any collateral and other security given or to be given in connection with the Agreement and Agreement Documents, as herein modified, against the rights of third persons having an interest therein; (2) provide information to third persons relative to the Agreement and Agreement Documents, as herein modified, Purchaser's liens and security interests in any collateral and other security, or otherwise with respect to Seller; and (3) subordinate its liens and security interests in any collateral and other security to the interests of any third persons or to enter into control agreements relative to such collateral and other security

**PURCHASER** is authorized to maintain, store and otherwise retain this amendment and the other documents constituting the Agreement and Agreement Documents in their original, inscribed tangible forms or records thereof in an electronic medium or other non-tangible medium which permits such records to be retrieved in perceivable forms.

**IN WITNESS WHEREOF**, the parties have executed this amendment effective this the _____ day of July, 2013.

**SELLER:**           **NUMIRA BIOSCIENCES, INC.**

By:_____
Print Name:\_\_\_\_Michael Beeuwsaert\_\_\_\_
Title:_____President_____

**PURCHASER:**           **PORTER CAPITAL CORPORATION**

By:_____
Print Name:_____
Title:_____